956 F.2d 1167
 148 L.R.R.M. (BNA) 2319
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
IDEAL DYEING AND FINISHING CO., INC., Respondent.
 No. 91-70103.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 3, 1992.
Decided March 6, 1992.
 
 Before BRUNETTI, O'SCANNLAIN and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The National Labor Relations Board (the "Board") petitions for enforcement of its order holding that Ideal Dyeing and Finishing Co., Inc., ("Ideal") violated section 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), by terminating Juan Perez, and that the ensuing strike at Ideal was an unfair labor practice strike. Concluding that the Board's decision is supported by substantial evidence and that the Board correctly applied the governing law, we grant enforcement.
 
 
 3
 * In November 1986, the Union began trying to organize the 250 employees at Ideal's Los Angeles facility. The Union notified Ideal by letters dated January 30 and February 2, 1987, of its organizational efforts. About March 19, 1987, the Union distributed laminated union badges to supporters, and encouraged employees to wear them to work.
 
 
 4
 Juan Perez was discharged on March 26, 1987, allegedly for attempting to coerce fellow employee Alberto Roche to join the Union. Perez had worked for Ideal since March 1986. He worked on a compactor machine on the second shift, from 3 p.m. to 11 p.m. Perez was a union supporter who had solicited union authorization cards from employees and wore a union badge.
 
 
 5
 Alberto Roche worked as an extractor operator on the third shift, from 11 p.m. to 7 a.m.[1] On March 18, 1987, only two weeks after he began working at Ideal, Roche told plant manager Bill Eizentier that he would need a leave of absence to visit a sick relative in Guatemala. When Roche returned to the plant on March 26 to pick up his check, however, he told supervisor Ricardo Reyes that he was leaving because someone had told him on a daily basis that he would lose his job if he did not join the Union. At Eizentier's request, Roche was interviewed by Ideal's labor consultant, Bernard Margolis, with Reyes translating. At this meeting, a statement was written out for Roche, who does not speak or read English, to sign. The statement was translated to Roche before he signed it. The statement reads:
 
 
 6
 At 4:00 P.M. on 3/26/87 Alberto Roche came into Bill Eizentier to resign his job. In the course of the exit interview Mr. Roche said he was quitting because during the two weeks he worked here Jaun [sic] Perez at least 8 times attempted to threaten and intimadate [sic] him with the loss of his job. Jaun [sic] Perez said "If he didn't sign a card or carry a badge when the Union came in he would not have a job." Jaun [sic] Perez also asked me for my home address, so he could pick me up to take me to a meeting. I did not give him my address. Because of this pressure I came into Mr. Eizentiers [sic] office to quit my job.
 
 
 7
 On the basis of this statement, Margolis recommended that Ideal fire Perez, which Ideal proceeded to do.
 
 
 8
 Perez was discharged at about 5:30 p.m. on March 26. On his way out of the plant, he told other employees that he had been fired for union activities. As a result, a number of employees gathered outside the office of the dye house manager, Richard Sheriff, saying they would not go back to work until Perez was reinstated. Eventually, the police were called and cleared the premises. The employees immediately began a strike against Ideal.
 
 
 9
 In a letter dated November 24, 1987, the Union made an unconditional offer to return to work on behalf of all strikers. Ideal agreed to place the strikers on a preferential hiring list, but declined to reinstate them immediately.
 
 
 10
 The Board subsequently brought a complaint against Ideal, alleging that Ideal had committed unfair labor practices by, among other things, discharging Perez and failing to grant immediate reinstatement to returning strikers. Hearings were held on these allegations before an ALJ, who issued a recommended decision concluding that the discharge of Perez was an unfair labor practice and the strike was an unfair labor practice strike throughout its duration.
 
 
 11
 The Board affirmed the ALJ, holding that the termination of Perez violated section 8(a)(1) of the Act, the strike was therefore an unfair labor practice strike, and the failure to reinstate the strikers upon their conditional return to work violated sections 8(a)(1) and 8(a)(3).[2] The Board issued an Order requiring Ideal to cease and desist from the unfair labor practices found. The Order further requires Ideal to reinstate Juan Perez and the strikers, and to make them whole for lost earnings.
 
 II
 
 12
 The Board found that Perez had been terminated because Ideal mistakenly believed that Perez had threatened Roche with loss of his job if he did not join the Union. Relying on NLRB v. Burnup & Sims, 379 U.S. 21 (1964), the Board held that Perez' dismissal under these circumstances violated section 8(a)(1) of the Act. Ideal challenges this holding on three grounds. First, Ideal asserts that the Board erred in concluding that the General Counsel had met his burden of showing that Perez was not in fact the person who threatened Roche. Second, Ideal contends that, even if Perez did not threaten Roche, his termination was not an unfair labor practice because Ideal was not motivated by anti-union animus. Finally, Ideal argues that Perez' termination was not an unfair labor practice because Ideal had no knowledge that Perez was engaging in protected activities at the time of his termination. We are not persuaded.
 
 
 13
 * Although Union activities are protected under the Act, employees who engage in serious misconduct in the course of such activities lose that protection and may be discharged. See General Teamsters Local No. 162 v. NLRB, 782 F.2d 839, 841 (9th Cir.1986). Once an employer establishes a good-faith belief that an employee engaged in misconduct during the course of union activity, the burden shifts to the General Counsel to demonstrate affirmatively that the employee did not in fact engage in the alleged misconduct. General Teamsters, 782 F.2d at 842. We conclude that substantial evidence supports the ALJ's determination that the General Counsel met that burden here.
 
 
 14
 Both sides agree that Perez was discharged based on Ideal's belief that he had engaged in misconduct by threatening Roche in order to induce Roche to join the Union. At the hearing before the ALJ, Roche testified, through an interpreter, that the person who threatened him was a fat man who worked on the extractors starting at 7:00 a.m. The most detailed testimony concerning the time and place of the threats took place in the following colloquy:
 
 
 15
 Roche: I didn't work with him per se. He would begin his shift at
 7:00. I would start at 11:00 and leave at 7:00. He would
 start at 7:00.
 ALJ: So he relieved you?
 Roche: Yes.
 ALJ: You started at 11:00 p.m.?
 Roche: Yes.
 Attorney: And did he work on the same machine that you did?
 Roche: Yes.
 
 
 16
 This testimony is not consistent with Ideal's accusations against Perez, because Perez did not work on the extractors, and did not begin his shift at 7:00 a.m.
 
 
 17
 Ideal relies heavily on two statements made by Roche in the course of his testimony. Roche stated that he was threatened "every time I'd be going there," and that this man talked to him about the Union "[e]ach time I go on." In context, these statements, delivered through a translator, indicate that the conversations about the Union occurred every day Roche worked at Ideal. They do not diminish the force of Roche's repeated and specific testimony about the time of the harassment.[3]
 
 
 18
 The strongest evidence linking Perez to the threats is that Perez was named as the miscreant in Roche's signed statement. However, Roche testified that, after he told Reyes and Margolis about the threats, they "mentioned out the names for me." The ALJ concluded from this statement that Reyes or Margolis had suggested Perez' name to Roche as the person who threatened him.
 
 
 19
 Ideal asserts that Roche identified Perez at the hearing as the person who threatened him. The record does not support this claim. Roche mentioned Perez' name only once, under questioning by the General Counsel's attorney, who asked about a photograph Roche said he had been shown in the office of Ideal's attorney. The following exchange ensued:
 
 
 20
 Attorney: What was that photo? What did that photo show?
 Roche: Supposedly, the man that was mentioning to me the Union so often at that time.
 Attorney: Do you recall that man's name?
 Roche: His name is, I believe, Juan Perez.
 Attorney: Did you recall the name prior to the interview?
 Roche: Because I wasn't paying all that much attention to that
 because I had left that job for some time before that. I
 did remember, but not how he looked or anything. When I
 signed that sheet of paper, they told me I wasn't going to
 have any problems or anything.
 
 
 21
 This testimony indicates that Ideal's attorney showed Roche a picture of Perez, suggesting to Roche that Perez was the one who had threatened him. Roche apparently was unable to recall how the harasser looked. We do not view this testimony as identification of Perez by Roche.
 
 B
 
 22
 Ideal next argues that Perez' discharge was not an unfair labor practice because it was not the product of anti-union animus. This contention is flatly inconsistent with Burnup & Sims, in which the Supreme Court held that an employer who discharges an employee in the good faith but mistaken belief that the employee has engaged in misconduct in the course of union activity commits an unfair labor practice. The Court ruled that lack of an anti-union motive is not a defense to such an unfair labor practice charge. See Burnup & Sims, 379 U.S. at 22 ("we are of the view that in the context of this record § 8(a)(1) was plainly violated, whatever the employer's motive"); id. at 23 ("Defeat of those rights by employer action does not necessarily depend on the existence of an anti-union bias. Over and again the Board has ruled that § 8(a)(1) is violated if an employee is discharged for misconduct arising out of a protected activity, despite the employer's good faith, when it is shown that the misconduct never occurred.").
 
 
 23
 NLRB v. Brown, 380 U.S. 278 (1965), and American Ship Building v. NLRB, 380 U.S. 300 (1965), do not modify the rule announced in Burnup & Sims. Brown and American Ship Building both concerned employer lockouts, Brown in the face of a whipsaw strike, and American Ship Building after an impasse in a labor dispute. While holding that these lockouts did not amount to unfair labor practices, in part because the employer was not motivated by anti-union hostility, the Court noted that an employer action "demonstratively destructive of employee rights and ... not justified by the service of significant or important business ends" is an unfair labor practice notwithstanding the employer's motivation. Brown, 380 U.S. at 282. The Court cited to Burnup & Sims in support of that proposition. In the face of that citation, these lockout cases can hardly be read as overruling the clear holding of Burnup & Sims that the employer's motivation is irrelevant when an employee is mistakenly discharged for misconduct in the context of protected activities.
 
 C
 
 24
 Finally, Ideal contends that, because it had no knowledge that Perez was engaged in protected activity, Burnup & Sims does not apply.
 
 
 25
 In Burnup & Sims, the Supreme Court held that an employer committed an unfair labor practice by discharging employees in the honest but mistaken belief that, while soliciting Union memberships, they had threatened violence. 379 U.S. at 21. Ideal clings to the Court's statement that:
 
 
 26
 In sum, § 8(a)(1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of the misconduct.
 
 
 27
 379 U.S. at 23. Ideal apparently reads the quoted statement to preclude a finding of an unfair labor practice if the employer is doubly mistaken, that is, if the discharged employee not only did not engage in the alleged misconduct but also was not engaged in the alleged union activity leading to the discharge. Under Ideal's reading of Burnup & Sims, apparently, an employer who was mistaken about the scope of the employee's actions would be liable, but one who was mistaken about the identity of the employee involved in the incident would not.
 
 
 28
 Ideal does not deny that it knew of the Union organization campaign at the time of Perez' discharge. Moreover, it is clear that Ideal believed Perez was soliciting Union memberships, a protected activity, at the time of the alleged misconduct. The Roche statement, upon which Ideal relied in terminating Perez, stated that Perez had threatened him with the loss of his job if he did not sign a Union card, and also that Perez had offered to take him to a Union meeting.
 
 
 29
 Ideal's claim that it did not actually know of Perez' union activities, and that Perez may not even have been a Union supporter, does not provide a defense. Termination of an employee for union activity is an unfair labor practice even if the discharged employee was not in fact a union supporter. NLRB v. Link-Belt Co., 311 U.S. 584, 589-90 (1941); NLRB v. J.G. Boswell Co., 136 F.2d 585, 595 (9th Cir.1943); Salisbury Hotel, Inc., 283 N.L.R.B. No. 101, 125 L.R.R.M. 1020, 1021 (1987). The same rule should apply when termination is for misconduct alleged to have occurred during union activities. That the employee not only did not commit the misconduct but also did not engage in the union activity does not ameliorate the effect on other employees of such a termination.
 
 
 30
 Moreover, Perez apparently was engaged in protected activity, whether or not Ideal realized it. Perez testified that he was on the Union organizing committee, wore a Union badge, and asked fellow employees to sign Union cards. Other employees presumably realized that Perez was a Union supporter. Under the circumstances, the Board could reasonably conclude that Perez' firing would have a chilling effect on other employees' exercise of their right to engage in protected activity. The Board's interpretation of the Act to impose liability on Ideal is reasonable and consistent with the purposes of the Act. We therefore decline to disturb it. See NLRB v. Howard Elec. Co., 873 F.2d 1287, 1291 (9th Cir.1989).
 
 III
 
 31
 The Board found that the strike which followed Perez' termination was an unfair labor practice strike. Ideal contends that this finding is not supported by substantial evidence. We disagree.
 
 
 32
 A strike is an unfair labor practice strike if it is caused in part by unfair labor practices, despite the presence of other motivating factors. Northern Wire Corp. v. NLRB, 887 F.2d 1313, 1319 (7th Cir.1989); NLRB v. West Coast Casket Co., 205 F.2d 902, 907 (9th Cir.1953). We have already upheld the Board's conclusion that the termination of Perez was an unfair labor practice.
 
 
 33
 Substantial evidence supports the Board's factual finding that the discharge of Perez caused and contributed to the strike at its inception. Perez' exhortations to co-workers immediately following his discharge precipitated a work stoppage. A number of employees ceased work and refused to leave unless Perez was reinstated. They left when threatened with arrest, and immediately went to the union hall to prepare picket signs and begin picketing.
 
 
 34
 Nor was the strike later converted into a strike for recognition. In support of this claim, Ideal cites only the vague testimony of Ideal's dye house manager to the effect that some unidentified employees may have agreed at one point during the strike to return to work if Ideal would sign a contract with the Union. The Board properly found that this limited evidence did not demonstrate that the employees had abandoned the goal of achieving reinstatement of Perez, particularly in light of supervisor Reyes' testimony that a group of strikers demanded Perez' return several days later.
 
 
 35
 Ideal contends it is inequitable for the Board to find an unfair labor practice strike based on the termination of a single employee. In several previous cases, however, this court has upheld orders of the Board finding that the discharge of a single employee in violation of the Act led to an unfair labor practice strike. See Servair, Inc. v. NLRB, 726 F.2d 1435, 1441 (9th Cir.1984); Airport Parking Management v. NLRB, 720 F.2d 610, 614 (9th Cir.1983); Shattuck Denn Mining v. NLRB, 362 F.2d 466, 471 (9th Cir.1966).
 
 
 36
 Aside from its unsupported assertion that the discharge of Perez was not a serious unfair labor practice, Ideal offers no basis for distinguishing this case from those precedents. Although Ideal may have acted in good faith, the firing of Perez for alleged misconduct in the course of Union organizing efforts might have had a substantial chilling effect on those efforts. See Burnup & Sims, 379 U.S. at 23. The Board reasonably concluded that the strike was an unfair labor practice strike.
 
 IV
 
 37
 Ideal's final contention is that the Board's order requiring reinstatement of all strikers, and perhaps creating liability for "an onerous amount of backpay" is inequitable, because the single unfair labor practice resulted from a good faith belief that Perez had engaged in misconduct. As a general rule, unfair labor practice strikers are entitled to immediate reinstatement upon an unconditional offer to return to work. NLRB v. Champ, 933 F.2d 688, 697 (9th Cir.1990), cert. denied, 112 S.Ct. 416 (1991). In accordance with this rule, the Board, having determined that the strike was an unfair labor practice strike, ordered Ideal to reinstate all strikers.
 
 
 38
 Ideal claims this order is inequitable because it may have been under a legal duty to fire Perez in order to avoid liability for constructive discharge of Roche. This argument is specious. Ideal cites Title VII's prohibition on sexual harassment, which obviously is not relevant to this case. Ideal also argues that refusal to fire Perez might have amounted to constructive discharge of Roche. However, even assuming the harassment of Roche could have amounted to constructive discharge, Ideal was clearly not required to discharge a suspected culprit, who had not been named or pointed out by the victim, without even a cursory investigation of the alleged incident. Ideal was simply not presented with the naked choice of either ignoring Roche's allegations at the risk of liability or immediately discharging Perez.
 
 
 39
 To the extent that Ideal's argument can be construed as a challenge to the Board's choice of remedy, we reject it as well. The Board has broad discretion in the adoption of a remedy, so long as the remedy selected is consistent with the purposes of the Act. Requiring reinstatement of unfair labor practice strikers has long been the policy of the Board. See, e.g., Shattuck Denn Mining, 362 F.2d at 471. Ideal offers no authority for the proposition that this remedy cannot be granted when the unfair labor practice is a mistaken discharge for misconduct.
 
 V
 
 40
 For the reasons stated above, we conclude that substantial evidence supports the Board's conclusions that the discharge of Perez was an unfair labor practice and that the strike was an unfair labor practice strike. The Board's choice of remedy is not inconsistent with the purposes of the Act. The Board's Order is therefore
 
 
 41
 ENFORCED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit R. 36-3
 
 
 [1]
 The Administrative Law Judge's ("ALJ") decision states that Roche worked on the compactor machine. Contrary to this finding, however, the parties stipulated, in Joint Exhibit 11, that Roche was an extractor operator
 
 
 [2]
 Section 8(a), 29 U.S.C. § 158(a), provides, in relevant part:
 It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 157 of this title.
 * * *
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....
 
 
 [3]
 In fact, the second quoted statement was closely followed by the explanation that the harassment occurred at 7:00, when Roche was signing out